# EXHIBIT

# 1

*16400 539*

Recording Requested By:
GUARANTEED RATE, INC.

*Commonwealth*

And After Recording Return To:
GUARANTEED RATE, INC.
3940 N RAVENSWOOD
CHICAGO, ILLINOIS 60613
Loan Number: 2006087722



CERTIFIED TO BE A TRUE AND
EXACT COPY OF THE ORIGINAL
By _____ Commonwealth Land Title

——————————————— [Space Above This Line For Recording Data] ———————————————

# DEED OF TRUST

**MIN:** 100196368000907280

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   JULY 11, 2006                   , together with all Riders to this document.

(B) "Borrower" is   JESSICA H. DELONG, ~~AN UNMARRIED WOMAN~~ a married woman as her sole and separate property

Borrower is the trustor under this Security Instrument.

(C) "Lender" is   GUARANTEED RATE, INC.

Lender is a   DELAWARE CORPORATION                                     organized and existing under the laws of   ILLINOIS
Lender's address is   3940 N RAVENSWOOD, CHICAGO, ILLINOIS 60613

(D) "Trustee" is   LANDAMERICA COMMONWEALTH TITLE

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated   JULY 11, 2006        .
The Note states that Borrower owes Lender   SIX HUNDRED FIFTY THOUSAND AND 00/100
Dollars (U.S. $ 650,000.00        ) plus interest.

Ca3005.mzd

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 1, 2036                    .

(G)   "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)   "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)   "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| [X] Adjustable Rate Rider | [ ] Planned Unit Development Rider |
| [ ] Balloon Rider | [ ] Biweekly Payment Rider |
| [ ] 1-4 Family Rider | [ ] Second Home Rider |
| [ ] Condominium Rider | [ ] Other(s) [specify] |

(J)   "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)   "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)   "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)   "Escrow Items" means those items that are described in Section 3.

(N)   "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)   "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)   "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)   "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)   "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| COUNTY | of | ALAMEDA | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

LOT 21, BLOCK 20, BOULEVARD PARK, FILED AUGUST 27, 1906, MAP BOOK 21, PAGE 50, ALAMEDA COUNTY RECORDS.
A.P.N.: 032-2104-037

which currently has the address of   3900 SANTA RITA STREET
                                                    [Street]

OAKLAND                           , California      94601      ("Property Address"):
[City]                                                        [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                    Page 3 of 14                      DocMagic eFormS  800-649-1362
                                                                                              www.docmagic.com

Ca3005.mzd

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

   The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.  **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.  **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                      Page 6 of 14                                      DocMagic *☎☎☎* 800-649-1362
                                                                                                      www.docmagic.com

Ca3005.mzd

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                            Page 9 of 14                          DocMagic *eForms* 800-649-1362
                                                                                                          www.docmagic.com

Ca3005.mzd

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                          Page 10 of 14                          *DocMagic eFarms* 800-649-1362
                                                                              *www.docmagic.com*

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The**

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                    Page 11 of 14                      *DocMagic* *ePorms* 800-649-1362
                                                                                                 www.docmagic.com

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                        Page 12 of 14                        *DocMagic eFtrms* 800-649-1362
                                                                                            www.docmagic.com

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JESSICA H. DELONG                -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

Witness:                         Witness:

_____   _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                    Page 13 of 14

DocMagic eFormstⁿ 800-649-1362
www.docmagic.com

Cx3005.mzd

State of California )

) ss.

County of ALAMEDA )

On JULY 15 2006 before me, *Savannah Jennings, notary public*

personally appeared JESSICA H. DELONG

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*Savannah Jennings*

NOTARY SIGNATURE

*Savannah Jennings*

(Typed Name of Notary)

NOTARY SEAL

# EXHIBIT

# 2

# ADJUSTABLE RATE NOTE
### (12 MAT Payment and Rate Caps)

MIN: 100196368000907280
Loan # 2006087722

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

JULY 11, 2006
[Date]                                         [City]                                    [State]

3900 SANTA RITA STREET, OAKLAND, CALIFORNIA 94601
[Property Address]

## 1.   BORROWER'S PROMISE TO PAY
    In return for a loan that I have received, I promise to pay U.S. $ 650,000.00            (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is GUARANTEED RATE, INC., A DELAWARE CORPORATION

I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.   INTEREST
### (A) Interest Rate
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of       1.950 %. This is my initial interest rate. The interest rate I will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.
### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of       SEPTEMBER      , 2006    , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date.
### (C) Interest Rate Limit
My interest rate will never be greater than          9.950 %.
### (D) Index
Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rate (H.15)" ("the Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of 15 days before each Interest Rate Change Date is called the "Current Index".
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
### (E) Calculation of Interest Rate Changes
    Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
THREE AND 200/1000           percentage point(s) (       3.200 %) to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

12 MAT Fixed Minimum Payment Adjustable Rate Note - Multistate

8480774 (0510)                                   VMP Mortgage Solutions, Inc. (800)521-7291                    Form 3005
                                                                                                               10/05

Ua3005.irm

## 3.   PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on  SEPTEMBER 1 2006  . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on  AUGUST 1, 2036            , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 4064 NORTH LINCOLN, #324, CHICAGO, ILLINOIS 60618                                                                         or at a different place required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 2,386.31        . This amount may change. My initial monthly payment may be an amount that is less than the amount that would be required to repay my unpaid principal on the Maturity Date in full in substantially equal installments.

### (C) Payment Change Dates

My monthly payment may change as required by Section 3(D) below beginning on the    1st            day of SEPTEMBER    , 2011       , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." My new monthly payment will be in the amount of the Full Payment unless the Full Payment is more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date, in which case my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date, but this limitation will not apply under the circumstances described in Section 3(F) or 3(G).

### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to principal will be the rate required by Section 2 above.

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to one hundred ONE HUNDRED TEN AND 000/1000       percent (           110.000 %) of the principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

### (G) Required Full Payment

On the 1st Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

## 4.   NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY  ** See attached Prepayment Note Addendum.**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a prepayment if I have not made all the monthly payments due under this Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use my prepayments to reduce the amount of principal that I owe under this Note. However, the Note Holder may apply my prepayment to the accrued and unpaid interest on the prepayment before applying my prepayment to reduce the principal amount of this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to these changes. My partial prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of my monthly payment by the end of  15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
    5.000      % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

Js3005.frm

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JESSICA H. DELONG        -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

*[Sign Original Only]*

U63005.htm

# EXHIBIT

# 3

## ADDENDUM TO ADJUSTABLE RATE NOTE
### (Prepayment)

Loan #: 2006087722

THIS ADDENDUM is made this **11th** day of **JULY 2006** , and is incorporated into and intended to form a part of the Note dated the same date as this Addendum.

1.  My right to make a Prepayment under Section 5 is modified by this Addendum. A Prepayment of the entire unpaid principal balance is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal balance is known as a "Partial Prepayment."

2.  Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first   **THREE**   ( **3** ) year(s) I make a Full Prepayment or Partial Prepayment(s) of more than twenty percent (20%) of the original principal amount in any twelve (12) month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

3.  All other provisions of the Note are unchanged by this Addendum and remain in full force and effect.

Dated: _____**7-15-06**_____

_____*Jessica H. Le Joy*_____ (Seal)
JESSICA H. DELONG                  -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

Indymac Bank Hard Prepayment Addendum - ARM
Non-Federally Exempted Sellers:
AL, AZ, CA, CO, CT, DE, FL, HI, ID, IL, IN, MT, ND,
NE, NH, NV, OK, SD, TN, UT, WA, WY,
AR (loan amounts greater than $150,000)
NY (1 year only and if ARM, must have at least a 5-yr fixed rate period),
TX (interest rate cannot exceed 12%)

84B0002 (0603)                    VMP Mortgage Solutions, Inc.                    SPD #002
                                                                                  (03/06)

Spd002.izm

# EXHIBIT

# 4

## ADJUSTABLE RATE RIDER
### (12 MAT Payment and Rate Caps)

Loan #: 2006087722

THIS ADJUSTABLE RATE RIDER is made this 11th day of       JULY       , 2006 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
GUARANTEED RATE, INC., A DELAWARE CORPORATION

(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:

3900 SANTA RITA STREET, OAKLAND, CALIFORNIA 94601
[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST
RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE
AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.
THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE
AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT
STATED IN THE NOTE.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
I will make all payments under this Note in the form of cash, check or money order.

### 2. INTEREST
#### (A) Interest Rate
Interest will be charged on unpaid principal until the full amount of principal has been
paid. I will pay interest at a yearly rate of       1.950 %. This is my initial
interest rate. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of this Note.
#### (B) Interest Rate Change Dates
The interest rate I will pay may change on the first day of SEPTEMBER      ,2006    ,
and on that day every month thereafter. Each date on which my interest rate could change is
called an "Interest Rate Change Date." The new rate of interest will become effective on
each Interest Rate Change Date.

**12 MAT Fixed Minimum Payment Adjustable Rate Rider - Multistate**

Page 1 of 5                  Form 3006
VMP Mortgage Solutions, Inc. (800)521-7291                11/15/05

**(C) Interest Rate Limit**
My interest rate will never be greater than                9.950 %.
**(D) Index**
Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the monthly yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rate (H.15)" ("the Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new Index that is based upon comparable information. The Note Holder will give me notice of this choice.
**(E) Calculation of Interest Rate Changes**
Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 200/1000
percentage point(s)(          3.200 %) to the Current Index. Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3. PAYMENTS
**(A) Time and Place of Payments**
I will pay principal and interest by making payments every month.
I will make my monthly payments on the first day of each month beginning on SEPTEMBER 1 , 2006 . I will make these payments every month until I have paid all the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on AUGUST 1, 2036      , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at 4064 NORTH LINCOLN, #324, CHICAGO, ILLINOIS 60618
or at a different place if required by the Note Holder.
**(B) Amount of My Initial Monthly Payments**
Each of my initial monthly payments will be in the amount of U.S. $2,386.31           .
This amount may change. My initial monthly payment may be an amount that is less than the amount that would be required to repay my unpaid principal on the Maturity Date in full in substantially equal installmets.
**(C) Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the first day of SEPTEMBER 1 , 2011 , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

3006.inm

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D) Calculation of Monthly Payment Changes**

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." My new monthly payment will be in the amount of the Full Payment unless the Full Payment is more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date, in which case my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date, but this limitation will not apply under the circumstances described in Section 3(F) or 3(G).

**(E) Additions to My Unpaid Principal**

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder also will add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to principal will be the rate required by Section 2 above.

**(F) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to one hundred ONE HUNDRED TEN AND 000/1000                     percent (      110.000 %) ( $715,000.00        ) of the principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid principal under Section 3(E) above could cause my unpaid principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month.

**(G) Required Full Payment**

On the 1st Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

3006.imm

### 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

8480782 (0511)                              Page 4 of 5                              Form 3006
                                                                                    11/15/05

3006.srvn

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)                    _____ (Seal)
JESSICA H. DELONG        -Borrower                                            -Borrower

_____ (Seal)                    _____ (Seal)
                         -Borrower                                            -Borrower

_____ (Seal)                    _____ (Seal)
                         -Borrower                                            -Borrower

_____ (Seal)                    _____ (Seal)
                         -Borrower                                            -Borrower

8480782 (0511)                    Page 5 of 5                    **Form 3006**
                                                                **11/15/05**

3006.irem

# EXHIBIT

# 5

## ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE
## 5 YEAR FIXED PAYMENT 12-MONTH AVERAGE OF MONTHLY 1-YR CONSTANT MATURITY INDEX PAYMENT-CAPPED NON-CONVERTIBLE ARM

Date: JULY 11, 2006                                    Loan #: 2006087722

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering, which is called the "5 Year Fixed Payment 12 MAT Payment-Capped Non-Convertible ARM." The interest rate and payment of this loan may each change during the term of this loan.  THIS LOAN ALLOWS FOR NEGATIVE AMORTIZATION. Information on other ARM programs available from the lender will be provided upon request. This disclosure is not a commitment on the part of the lender to make a loan to you.

### HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED

- Your Interest Rate will be based on an Index Rate plus a Margin.  Please ask us for our current Interest Rate and Margin.

- Your initial Interest Rate will not be equal to an Index Rate plus a Margin. If the initial Interest Rate is below the then-current Index plus Margin (the "fully-indexed rate"), then the initial Interest Rate will be a "Discounted" Interest Rate. If the initial Interest Rate is above the then-current fully-indexed Interest Rate, then the initial Interest Rate will be a "Premium" Interest Rate. Please ask us about the current Discount or Premium.

- The Index Rate is based on the twelve-month average of monthly yields on actively traded United States Securities, adjusted to a constant maturity of one year.  The Index is calculated by adding together the monthly yields on Treasury securities of one-year constant maturity, as published in the Federal Reserve Board Statistical Release H.15, for the preceding 12 months available and dividing the result by twelve. If the index is no longer available, the lender will choose a new index based on comparable information. Since movement of the Index is usually related to market conditions that cannot be predicted, it is impossible to know in advance exactly how much interest you will have to pay over the life of the loan.  The index rate used below was in effect on December 1, 2005.

- When your Interest Rate changes, your new Interest Rate will equal the Index Rate plus our Margin unless your lifetime Interest Rate Cap limits the amount of change in the Interest Rate.

- Your initial payment will be based on the starting interest rate on the loan, the loan amount and the term of the loan. When your payment changes, your new payment will be based on the lesser of two calculations: the payment based on the Interest Rate (calculated by adding the Index plus Margin), loan balance, and remaining loan term or the previous payment amount plus or minus 7.5% of the previous payment amount unless you have reached a re-amortization period or the maximum negative amortization amount as stated below.

### HOW YOUR INTEREST RATE CAN CHANGE

Your Interest Rate will adjust monthly after the first payment date and will be equal to the sum of the Index value plus the Margin, subject to the following limits:

- Your Interest Rate may increase or decrease substantially over the life of the loan.

- If an Interest Rate change results in an increase in the Interest Rate, your monthly payment may not be sufficient to cover the interest due and may not fully amortize your loan.

- Your Interest Rate over the life of the loan cannot exceed an Interest Rate between 8.00 and 12.95%. Please ask us about our current maximum rate.  There is no life time interest rate floor.

- Approximately 15 days before each rate adjustment date, your new Interest Rate will be determined by adding the Margin to the then current Index.

### HOW YOUR PAYMENT CAN CHANGE

- Your payment may increase or decrease substantially over the life of the loan.

- Your payment may change on the 61st payment and then every 12 months thereafter.

- Your payment cannot be increased or decreased by more than 7.5% from the previous payment, or an amount sufficient to pay the unpaid balance in full by the maturity date at the interest rate effective for that month, whichever is less, except if your outstanding balance reaches 110% of the original loan amount or at the 1st payment adjustment and every 5th scheduled payment adjustment. This is called the Minimum Monthly Payment. If you make only the Minimum Monthly Payment, your payment may increase substantially at the 1st payment adjustment and every 5th scheduled payment or you may reach the 110% of the original loan amount at which time your payment will increase substantially.

IndyMac 5 Year Fixed Payment 12 MAT ARM Disclosure

D9905.lsm

- If the monthly payment is not sufficient to cover the interest due, the difference will be added to your loan amount and will accrue additional interest. This is called "Negative Amortization."
- At the 1st payment adjustment and every 5th scheduled payment adjustment, your payment calculation will only be based on the then current Interest Rate, remaining balance and remaining term of the loan. The 7.5% Payment Cap will not apply for those adjustments.
- The unpaid principal balance of your loan can never exceed 110% of the original amount borrowed. If that limit is reached, your monthly payment amount will be changed to an amount sufficient to pay off the unpaid principal balance over the remaining life of the loan at the Interest Rate then in effect.

**DEFERRED INTEREST**

Deferred interest (also known as Negative Amortization) may occur in two ways:

- Because the Interest Rate has the potential to increase each month but the payment changes are generally limited to once every twelve months, the monthly payment may be insufficient to pay the interest which is accruing; and/or
- When normal payment changes occur every twelve months, the payment is limited to an increase of 7.500% from the previous payment amount, which may be less than the interest that is accruing.

If the interest due on your loan for a month is more than the required monthly payment, the entire payment will be applied to interest and any unpaid interest will be added to the loan balance. The interest for the next month is then calculated on the new increased loan balance.

"Accelerated Amortization" may occur if the Interest Rate decreases in those months that the Interest Rate changes but the payment does not change or if the Interest Rate decreases more than the payment changes due to the 7.500% Payment Cap when the payment changes at each twelve-month interval. "Accelerated Amortization" means you may pay more per month than what is required to pay off the loan in the remaining term. Therefore, you may possibly pay the loan off earlier than the original maturity of the loan.

In addition to the Minimum Monthly Payment, you have two other options in making your payment. You may make a fully amortizing payment that is a payment that pays all the interest owed for the month plus principal or you may also choose to make a monthly "interest-only" payment. The fully amortizing payment and the interest-only payment is available only if the payment amount is greater than the Minimum Monthly Payment option. An interest-only payment amount will cover the full interest costs for that month; therefore, no additional (deferred) interest will be added to your loan balance. Your principal balance will not be increased or reduced. An interest-only payment is allowed until a fully amortizing payment is required as described above.

**FOR EXAMPLE:**

First Example: Lifetime cap of 8.00%, 30 year term

On a $10,000, 360-month loan with an initial Interest Rate of 2.200% in effect on December 1, 2005, the Interest Rate could rise to a maximum of 8.000%. The initial Interest Rate reflects a recent Discount of 3.526% and a Margin of 2.400% (your initial Interest Rate, Discount or Premium and Margin may be different). The following worse case example illustrates what would happen to your payments if the Interest Rate increased at the first adjustment to the maximum lifetime Interest Cap of 8.000% and remained there for the term of the loan. The example uses a $10,000 loan amount, an initial Interest Rate of 2.200%, a lifetime Interest Cap of 8.000%, a Discount of 3.526% and a Margin of 2.400%.

| Loan Term | Initial Payment | Maximum Payment | Month in which Maximum Payment is reached |
|-----------|-----------------|-----------------|-------------------------------------------|
| 30 years | $37.97 | $82.72 | Payment 34 |

To see what your payments (excluding impounds or escrow payments for taxes, insurance and other purposes relating to the security property) would have been during that period, divide your mortgage amount by $10,000; then multiply the loan payment by the amount. For example, the initial monthly payment for a $100,000 loan would be:   $100,000 ÷ $10,000 = 10
         10 x $37.97 = $379.70

Second Example: Lifetime cap of 8.00%, 40 year term

On a $10,000, 480-month loan with an initial Interest Rate of 2.200% in effect on December 1, 2005 the Interest Rate could rise to a maximum of 8.000%. The initial Interest Rate reflects a recent Discount of 3.6260% and a Margin of 2.500% (your initial Interest Rate, Discount or Premium and Margin may be different). The following worse case example illustrates what would happen to your payments if the Interest Rate increased at the first adjustment to the maximum lifetime Interest Cap of 8.000% and remained there for the term of the loan. The example uses a $10,000 loan amount, an initial Interest Rate of 2.200%, a lifetime Interest Cap of 8.000%, a Discount of 3.6260% and a Margin of 2.500%.

| Loan Term | Initial Payment | Maximum Payment | Month in which Maximum Payment is reached |
|-----------|-----------------|-----------------|-------------------------------------------|
| 40 years | $31.35 | $76.99 | Payment 29 |

To see what your payments (excluding impounds or escrow payments for taxes, insurance and other purposes relating to the security property) would have been during that period, divide your mortgage amount by $10,000; then multiply the loan payment by the amount. For example, the initial monthly payment for a $100,000 loan would be:   $100,000 ÷ $10,000 = 10
         10 x $31.35 = $313.50

IndyMac 5 Year Fixed Payment 12 MAT ARM Disclosure

**Third Example: Lifetime cap of 12.95%, 30 year term**

On a $10,000, 360-month loan with an initial Interest Rate of 2.200% in effect on December 1, 2005, the Interest Rate could rise to a maximum of 12.950%. The initial Interest Rate reflects a recent Discount of 3.4260% and a Margin of 2.300% (your initial Interest Rate, Discount or Premium and Margin may be different). The following worse case example illustrates what would happen to your payments if the Interest Rate increased at the first adjustment to the maximum lifetime Interest Cap of 12.950% and remained there for the term of the loan. The example uses a $10,000 loan amount, an initial Interest Rate of 2.200%, a lifetime Interest Cap of 12.950%, a Discount of 3.4260% and a Margin of 2.300%.

| Loan Term | Initial Payment | Maximum Payment | Month in which Maximum Payment is reached |
|-----------|-----------------|-----------------|-------------------------------------------|
| 30 years | $37.97 | $121.10 | Payment 15 |

To see what your payments (excluding impounds or escrow payments for taxes, insurance and other purposes relating to the security property) would have been during that period, divide your mortgage amount by $10,000; then multiply the loan payment by the amount. For example, the initial monthly payment for a $100,000 loan would be: $100,000 ÷ $10,000 = 10
10 x $37.97 = $379.70

**Fourth Example: Lifetime cap of 12.95%, 40 year term**

On a $10,000, 480-month loan with an initial Interest Rate of 2.200% in effect on December 1, 2005, the Interest Rate could rise to a maximum of 12.950%. The initial Interest Rate reflects a recent Discount of 4.213% and a Margin of 2.300% (your initial Interest Rate, Discount or Premium and Margin may be different). The following worse case example illustrates what would happen to your payments if the Interest Rate increased at the first adjustment to the maximum lifetime Interest Cap of 12.950% and remained there for the term of the loan. The example uses a $10,000 loan amount, an initial Interest Rate of 1.250%, a lifetime Interest Cap of 12.950%, a Discount of 4.213% and a Margin of 2.300%.

| Loan Term | Initial Payment | Maximum Payment | Month in which Maximum Payment is reached |
|-----------|-----------------|-----------------|-------------------------------------------|
| 40 years | $31.35 | $119.05 | Payment 14 |

To see what your payments (excluding impounds or escrow payments for taxes, insurance and other purposes relating to the security property) would have been during that period, divide your mortgage amount by $10,000; then multiply the loan payment by the amount. For example, the initial monthly payment for a $100,000 loan would be: $100,000 ÷ $10,000 = 10
10 x $31.35 = $313.50

**NOTICE OF CHANGE**

You will be notified in writing at least 25, but no more than 120, days before the due date of the first payment that will be at the new level. This notice will contain information about the current and prior Index values on which your current and prior interest rates are based, your current and prior interest rates, new payment amount and loan balance.

**ASSUMPTION OF LOAN**

Although the loan contains a due-on-sale clause, the Lender will consent to a transfer of the property, provided the transferee meets Lender's current loan underwriting criteria. The transferee will be required to execute a written assumption agreement and pay Lender an assumption fee in an amount not to exceed the amount Lender requires for other similar transactions. All original terms will remain the same.

**PREPAYMENT FEE**

Depending upon the interest rate and terms of your loan, your loan may have a prepayment fee. A prepayment fee is a charge that may be incurred for paying off your loan during the first three years or less of your loan term. Please ask us if your loan has a prepayment fee.

I/We acknowledge receipt and have read the Adjustable Rate Mortgage Program Disclosure and the Consumer Handbook on Adjustable Rate Mortgages.

| Borrower  JESSICA H. DELONG | Date | Borrower | Date |
|-----------------------------|------|----------|------|

| Borrower | Date | Borrower | Date |
|----------|------|----------|------|

| Borrower | Date | Borrower | Date |
|----------|------|----------|------|

IndyMac 5 Year Fixed Payment 12 MAT ARM Disclosure

84B0723 (0903)                                    Page 3 of 3                                    Prime #300B
(3/2005)

# EXHIBIT

# 6

JUN. 29. 2006  5:03PM  CAPITAL MARKET FUND                    NO. 3575   P. 64
JUN. 27. 2006  2:45PM   CAPITAL MARKET FUND                   NO. 3502   P. 7/8



guaranteed

**IMPORTANT LOAN INFORMATION**
**ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE**
**PAY OPTION MTA**
*Please Read Carefully*

This disclosure describes the features of the Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs is available upon request.

**General Description of the ARM Program**

- After the initial introductory rate period (1 month to 3 months), your interest rate can change monthly.
- Your monthly payment amount can change every year (and in some cases more frequently than that) and can increase or decrease substantially based on changes in an interest rate.
- After the initial introductory rate period, your interest rate will be based on the index plus a Margin.
- MTA - The "Index" is the Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yield"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.
- The "Margin" is the amount added to the Index to calculate your interest rate. The Margin remains constant for the life of the loan. Ask us for the amount of our current interest rate and Margin.
- If you pay only the minimum monthly payment, your loan may incur negative amortization. Make sure you read the section on "Payment Information about Negative Amortization" below.

**How Your Initial Interest Rate and Initial Payment Amounts Will Be Determined**

- Initial Interest Rate. Your initial interest rate will be in effect for 1 month or 3 months, depending on the option you selected. Your initial interest rate has been a discounted rate and is not based on the Index used to make later adjustments. The discount by which the initial interest rate is less than the rate that would be determined by adding the Margin to the Index is called the "discount." Ask us for the amount of our current initial interest rate discount.
- Initial Payment Amount. Your initial payment will be based on the initial interest rate, with balloon and loan terms. The initial payment will be determined by submitting the amount required to repay the loan (principal and interest) in substantially equal monthly payments over the loan term at the initial interest rate. Your initial payment amount may be in effect for up to one year, even though your interest rate may change monthly. Your initial payment amount may not stay the same for the full year if a change is required due to the limits on negative amortization. Make sure you read the section on "How Your Payment Can Change," below.

**How Your Interest Rate Can Change**

- Your interest rate can change after the introductory period and monthly thereafter. The day the rate change is effective is the "Interest Rate Change Date."
- On each Interest Rate Change Date, the interest rate will be calculated by adding the Margin to the most recent Index figure available 15 days before Interest Rate Change Date. The result will be rounded to the nearest one-eighth of one percentage point (.125%). This rounded amount will be your new interest rate until the next Interest Rate Change Date.
  - Your interest rate will never be greater than 9.95%.
  - Beginning with the first Interest Rate Change Date, your interest rate will never be lower than the margin.

**How Your Payment Can Change**

- Your monthly payment can change on your 13th payment due date and every 12 months thereafter (these dates are called "Scheduled Payment Change Dates"), or more frequently if necessary to prevent the unpaid principal balance of your loan from exceeding a negative amortization cap, described more fully below.
- To calculate your monthly payment on a Scheduled Payment Change Date, we will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance in full at the maturity date in substantially equal payments at the interest rate in effect during the month preceding the Scheduled Payment Change Date. The result of this calculation is the amount of your new monthly payment. However, your new monthly payment will be limited to 7.5% more than the amount of your last monthly payment due before the Scheduled Payment Change Date unless either of the following additional restrictions apply:
  - Recalculated Full Payment. On the 5th Scheduled Payment Change Date and on every 5th Scheduled Payment Change Date thereafter (and on the final Scheduled Payment Change Date), the 7.5% limit on the increase in the payment change will not apply. Beginning on every 5th Scheduled Payment Change Date or the final Scheduled Payment Change Date, you will need to pay the amount sufficient to pay the unpaid balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the Scheduled Payment Change Date.
  - Limit on My Unpaid Principal. If you pay only the minimum monthly payment, the amount may not be sufficient to cover the interest due on your loan. For each month that your monthly payment is less than the interest due on your loan, we will reduce the amount of your monthly payment from the amount of interest due on your loan and will add the difference to your unpaid principal. This means that the balance of your loan could increase. This is known as "negative amortization." The unpaid principal balance of your loan may never exceed 115% (110% in New York) of the original amount borrowed. If your accumulating principal balance reaches that limit, we will immediately increase your monthly payment even if this means that the 7.5% limit on the change will not apply. We will make this change as often as not your monthly payment is otherwise scheduled to change and without regard to the 7.5% limit or the increase in the payment amount. Your new monthly payment amount will...

09/28/2006 11:18 FAX                    GUARANTEED RATE                    002/004

JUN. 29. 2006  5:03PM   CAPITAL MARKET FUND                    NO. 3575   P. 65
JUN. 27. 2006  2:46PM   CAPITAL MARKET FUND                    NO. 3502   P. 8/8

**guaranteed** 

be in effect until the next regular Scheduled Payment Change Date, subject to the 115% negative amortization cap (110% in New York), which could require another payment change.

- After the first Interest Rate Change Date, we may provide you with up to three (3) additional payment options that are greater than your monthly payment, which are called "Payment Options." You may be given the following Payment Options:
  - o **Interest Only Payment:** the amount that would pay the interest portion of the monthly payments at the current interest rate. The principal balance will not be decreased by this Payment Option.
  - o **Fully Amortized Payment:** the amount necessary to pay the loan off (principal and interest) at the maturity date is substantially equal payments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.
  - o **15 Year Amortized Payment:** the amount necessary to pay the loan off (principal and interest) within a fifteen (15) year term from the this payment due date in substantially equal payments. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

**Payment Options are only applicable if the rate margin due the monthly requirements.**

**Notice of Interest Rate and Payment Change**

- We will notify you once each year during which interest rate adjustments, have been made to your loan. This notice will contain information about your interest rate, index, payment amount and loan balance.
- We will notify you of any payment changes in writing at least 25 days, but no more than 120 days, before the due date of the payment at a new level. This notice will contain information about your interest rate, index, payment amount and loan balance.

**Example of Maximum Interest Rate and Minimum Payment Which Could Be Required**

On a $10,000 thirty year loan originated at an initial interest rate of 1% in effect in May, 2006, the maximum amount that the interest rate you rise under this program is 8.95%, to 9.95% the lifetime interest rate cap. The monthly payment can rise from a five-year payment of $31 to a maximum of $136 in the 5th year.

*The initial interest rate is equal to the index of 4.011%, plus a 3.190% margin, which a 6.1811% changes, rounded to the nearest 1/8%. The amount shown in this example is a $5,000 so we have used amounts your discount may be different.

To see what your payments would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be $60,000 = $10,000 = 6 x 31 = $135 per month.

**Important Information about Negative Amortization**

Negative Amortization means the mortgage balance is increasing. This occurs whenever your monthly mortgage payments are not large enough to pay all of the interest due on your mortgage.

Because payment caps limit only the amount of payment increase, and not increase rate increases, your monthly payments sometimes may not cover all of the interest due on your loan. This means that the interest shortage in your payment is automatically added to your unpaid principal balance, and interest may be charged on that amount. However, the unpaid principal balance of your loan can never exceed 115% (110% in New York) of the original amount borrowed. You may owe more later in the loan term than you did at the start.

If you have any questions, be sure to ask us about negative amortization to understand how it may apply to your loan.

_____          6/8/06
Borrower                                   Date

_____          _____
Borrower                                   Date

Payment Choice ARM                Page 2 of 2                05/01/06



**IMPORTANT LOAN INFORMATION**
**ADJUSTABLE RATE MORTGAGE LOAN PROGRAM DISCLOSURE**
**PAY OPTION MTA**
*Please Read Carefully*

This disclosure describes the features of the Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs is available upon request.

### General Description of the ARM Program

- After the initial introductory rate period (1 month or 3 months), your interest rate can change monthly.
- Your monthly payment amount can change every year (and in some cases more frequently than that) and can increase or decrease substantially based on changes in the interest rate.
- After the initial introductory rate period, your interest rate will be based on the Index plus a Margin.
- MTA: " The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12."
- The "Margin" is the amount added to the Index to calculate your interest rate. The Margin remains constant for the life of the loan. Ask us for the amount of our current interest rate and Margin.
- If you pay only the minimum monthly payment, your loan may have negative amortization. Make sure you read the section on "Important Information about Negative Amortization," below.

### How Your Initial Interest Rate and Initial Payment Amount Will Be Determined

- **Initial Interest Rate.** Your initial interest rate will be in effect for 1 month or 3 months, depending on the option you selected. Your initial interest rate has a discount feature and is not based on the Index used to make later adjustments. The amount by which the initial interest rate is less than the rate that would be determined by adding the Margin to the Index is called the "discount." Ask us for the amount of our current initial interest rate discount.
- **Initial Payment Amount.** Your initial payment will be based on the initial interest rate, loan balance and loan term. The initial payment will be determined by calculating the amount required to repay the loan (principal and interest) in substantially equal monthly payments over the loan term at the initial interest rate. Your initial payment amount may be in effect for up to one year, even though your interest rate may change monthly. Your initial payment amount may not stay the same for the full first year if a change is required due to the limits on negative amortization. Make sure you read the section on "How Your Payment Can Change," below.

### How Your Interest Rate Can Change

- Your interest rate can change after the introductory period and monthly thereafter. The day the rate change is effective is an "Interest Rate Change Date."
- On each Interest Rate Change Date, the interest rate will be calculated by adding the Margin to the most recent Index figure available 15 days before Interest Rate Change Date. The result will be rounded to the nearest one-eighth of one percentage point (.125%). This rounded amount will be your new interest rate unless one of these limits applies:
  - Your interest rate will never be greater than 9.95%.
  - Beginning with the first Interest Rate Change Date, your interest rate will never be lower than the margin.

### How Your Payment Can Change

- Your monthly payment can change on your 13th payment due date and every 12 months thereafter (these dates are called "Scheduled Payment Change Dates"), or more frequently if necessary to prevent the unpaid principal balance of your loan from exceeding a negative amortization cap, described more fully below.
- To calculate your monthly payment for a Scheduled Payment Change Date, we will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance in full on the maturity date in substantially equal payments at the interest rate in effect during the month preceding the Scheduled Payment Change Date. The result of this calculation is the amount of your new monthly payment. However, your new monthly payment will be limited to 7.5% more than the amount of your last monthly payment due before the Scheduled Payment Change Date unless either of the following additional restrictions apply:
  - **Required Full Payment.** On the 5th Scheduled Payment Change Date and on every 5th Scheduled Payment Change Date thereafter (and on the final Scheduled Payment Change Date), the 7.5% limit to the increase in the payment change will not apply. Beginning on every 5th Scheduled Payment Change Date on the final Scheduled Payment Change Date, you will need to pay the amount sufficient to pay the unpaid balance in full by the maturity date in substantially equal payments at the interest rate in effect during the month preceding the Scheduled Payment Change Date.
  - **Limit on My Unpaid Principal.** If you pay only the minimum monthly payment, the amount may not be sufficient to cover the interest due on your loan. For each month that your monthly payment is less than the interest due on your loan, we will subtract the amount of your monthly payment from the amount of interest due on your loan and will add the difference to your unpaid principal. **This means that the balance of your loan could increase. This is known as "negative amortization."** The unpaid principal balance of your loan can never exceed 115% (110% in New York) of the original amount borrowed. If your outstanding principal balance reaches that limit, we will immediately increase your monthly payment to an amount sufficient to pay off the unpaid principal balance over the remaining life of the loan. We will make this change whether or not your monthly payment is otherwise scheduled to change and without regard to the 7.5% limit to the increase in the payment amount. Your new monthly payment amount will



be in effect until the next regular Scheduled Payment Change Date, subject to the 115% negative amortization cap (110% in New York), which could require another payment change.

- After the first Interest Rate Change Date, we may provide you with up to three (3) additional payment options that are greater than your monthly payment, which are called "Payment Options." You may be given the following Payment Options:
  - o **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The principal balance will not be decreased by this Payment Option.
  - o **Fully Amortized Payment:** the amount necessary to pay the loan off (principal and interest) at the maturity date in substantially equal payments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.
  - o **15 Year Amortized Payment:** the amount necessary to pay the loan off (principal and interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

<u>Payment Options are only applicable if they are greater than the monthly payment amount.</u>

**Notice of Interest Rate and Payment Change**
- We will notify you once each year during which interest rate adjustments, but not payment adjustments, have been made to your loan. This notice will contain information about your interest rate, index, payment amount and loan balance.
- We will notify you of a payment change in writing at least 25 days, but no more than 120 days, before the due date of the payment at a new level. This notice will contain information about your interest rate, index, payment amount and loan balance.

**Example of Maximum Interest Rate and Maximum Payment Which Could Be Required**

On a $10,000 thirty year loan originated at an initial interest rate of 1%* in effect in May, 2006, the maximum amount that the interest rate can rise under this program is 8.95%, to 9.95% (the lifetime interest rate cap). The monthly payment can rise from a first-year payment of $32 to a maximum of $144 in the 5th year.

*The initial interest rate is equal to the index of 4.011%, plus a 3.150% margin, minus a 6.161% discount, rounded to the nearest 1/8%. The discount shown in this example is a discount we have used recently; your discount may be different.

To see what your payments would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. (For example, the monthly payment for a mortgage amount of $60,000 would be: $60,000 ÷ $10,000 = 6, 6 x 32 = $192 per month.

**Important Information about Negative Amortization**
Negative amortization means the mortgage balance is increasing. This occurs whenever your monthly mortgage payments are not large enough to pay all of the interest due on your mortgage.

Because payment caps limit only the amount of payment increase, and not interest rate increases, your monthly payments sometimes may not cover all of the interest due on your loan. This means that the interest shortage in your payment is automatically added to your unpaid principal balance, and interest may be charged on that amount. However, the unpaid principal balance of your loan can never exceed 115% (110% in New York) of the original amount borrowed. You may owe more later in the loan term than you did at the start.

If you have any questions, be sure to ask us about negative amortization to understand how it may apply to your loan.


_____          _____
Borrower                                  Date


_____          _____
Borrower                                  Date

# EXHIBIT

# 7

## FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
(THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

Loan Number: 2006087722

Date: JULY 11, 2006

Creditor: GUARANTEED RATE, INC.
Address: 3940 N RAVENSWOOD, CHICAGO, ILLINOIS 60613

Borrower(s): JESSICA H. DELONG

Address: 3900 SANTA RITA STREET, OAKLAND, CALIFORNIA 94601

Lines containing an "x" are applicable:

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | ☐ Total Sale Price The total cost of your purchase on credit including your down-payment of $ |
|---|---|---|---|---|
| 7.619 % | $1,128,062.68 | $647,834.11 | $1,775,896.79 | $ |

PAYMENTS: Your payment schedule will be:

| Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due | Number of Payments | Amount of Payment ** | When Payments Are Due |
|---|---|---|---|---|---|---|---|---|
| | | Monthly Beginning | | | Monthly Beginning | | | Monthly Beginning |
| 35 | 2,386.31 | 09/01/06 | | | | | | |
| 324 | 5,207.30 | 08/01/09 | | | | | | |
| 1 | 5,210.74 | 08/01/36 | | | | | | |

_____ DEMAND FEATURE: This obligation has a demand feature.

__X__ VARIABLE RATE FEATURE: Your loan contains a variable rate feature. Disclosures about the variable rate feature have been provided to you earlier.

INSURANCE: The following insurance is required to obtain credit:
_____ Credit life insurance and credit disability  __X__ Property Insurance  _____ Flood insurance  _____ Mortgage Insurance
You may obtain property insurance from any insurer that is acceptable to the Lender.

SECURITY: You are giving a security interest in 3900 SANTA RITA STREET, OAKLAND, CALIFORNIA 94601
_____ The goods or property being purchased  __X__ Real property you already own.

FILING FEES: $

LATE CHARGE: If payment is more than ____15____ days late, you will be charged ____5.000____ % of the payment.  * or $5.00 (whichever is greater)

PREPAYMENT: If you pay off early, you
__X__ may  _____ will not  have to pay a penalty.
_____ may  __X__ will not  be entitled to a refund of part of the finance charge.

ASSUMPTION: Someone buying your property
_____ may  __X__ may, subject to conditions  _____ may not  assume the remainder of your loan on the original terms.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

_____ "e" means an estimate  _____ all dates and numerical disclosures except the late payment disclosures are estimates.

Each of the undersigned acknowledge receipt of a complete copy of this disclosure. The disclosure does not constitute a contract or a commitment to lend.

Applicant JESSICA H. DELONG _____ 7-16-06 _____ Date

Applicant _____ Date        Applicant _____ Date

Applicant _____ Date        Applicant _____ Date

Applicant _____ Date        Applicant _____ Date

** NOTE: Payments shown above do not include reserve deposits for taxes, assessments, and property or flood insurance.

FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT
08/17/06

DocMagic eForms 800-649-1362
www.docmagic.com

Regid4.lst

Loan Number: 2006087722

# ACKNOWLEDGMENT OF RECEIPT OF GOOD FAITH ESTIMATE AND TRUTH IN LENDING ACT DISCLOSURES

Lender: GUARANTEED RATE, INC.

Borrower(s): JESSICA H. DELONG

Property Address: 3900 SANTA RITA STREET, OAKLAND, CALIFORNIA 94601

The undersigned ("you" or "your") hereby acknowledge receipt of a "good faith estimate" of the charges which you are likely to incur at the settlement of your loan as provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (12 U.S.C.A. 2601 et seq.), and all applicable disclosures required by the Truth in Lending Act, as amended (15 U.S.C.A. 1601 et seq.).

_____  7-15-06       _____
Borrower JESSICA H. DELONG       Date       Borrower                          Date

_____  _____       _____  _____
Borrower                          Date       Borrower                          Date

_____  _____       _____  _____
Borrower                          Date       Borrower                          Date

DocMagic *Ellinois* 800-649-1362
www.docmagic.com

Cssf.1tsc

# EXHIBIT

# 8

# NOTICE OF RIGHT TO CANCEL

Loan Number: 2006087722

Borrowers: JESSICA H. DELONG

Property Address: 3900 SANTA RITA STREET, OAKLAND, CALIFORNIA 94601

---

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is JULY 15, 2006              ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
GUARANTEED RATE, INC.
3940 N RAVENSWOOD
CHICAGO, ILLINOIS 60613

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of JULY 19, 2006 (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

---

_____          _____
Consumer's Signature                          Date
JESSICA H. DELONG

---

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____          7-15-06
JESSICA H. DELONG                          Date

---

NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
03/17/06

DocMagic *eFcrms* 800-649-1362
www.docmagic.com

# EXHIBIT

# 9

# NOTICE OF RIGHT TO CANCEL

Loan Number: 2006087722

Borrowers: JESSICA H. DELONG

Property Address: 3900 SANTA RITA STREET, OAKLAND, CALIFORNIA 94601

**YOUR RIGHT TO CANCEL**

You are entering into a transaction that will result in a mortgage, lien or security interest on or in your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

1. the date of the transaction, which is JULY 15, 2006        ; or
2. the date you receive your Truth in Lending disclosures; or
3. the date you receive this notice of your right to cancel.

If you cancel the transaction, the mortgage, lien or security interest is also cancelled. Within 20 calendar days after we receive your notice, we must take the steps necessary to reflect the fact that the mortgage, lien or security interest on or in your home has been cancelled, and we must return to you any money or property you have given to us or to anyone else in connection with this transaction.

You may keep any money or property we have given you until we have done the things mentioned above, but you must then offer to return the money or property. If it is impractical or unfair for you to return the property, you must offer its reasonable value. You may offer to return the property at your home or at the location of the property. Money must be returned to the address below. If we do not take possession of the money or property within 20 calendar days of your offer, you may keep it without further obligation.

**HOW TO CANCEL**

If you decide to cancel this transaction, you may do so by notifying us in writing, at
GUARANTEED RATE, INC.
3940 N RAVENSWOOD
CHICAGO, ILLINOIS 60613

You may use any written statement that is signed and dated by you and states your intention to cancel, or you may use this notice by dating and signing below. Keep one copy of this notice because it contains important information about your rights.

If you cancel by mail or telegram, you must send the notice no later than midnight of JULY 19, 2006 (or midnight of the third business day following the latest of the three events listed above). If you send or deliver your written notice to cancel some other way, it must be delivered to the above address no later than that time.

**I WISH TO CANCEL.**

_____          _____
Consumer's Signature                              Date
JESSICA H. DELONG

**ACKNOWLEDGMENT OF RECEIPT**

EACH OF THE UNDERSIGNED HEREBY ACKNOWLEDGES THE RECEIPT OF TWO (2) COMPLETED COPIES OF THIS NOTICE OF RIGHT TO CANCEL.

_____   7-15-06
JESSICA H. DELONG                          Date

NOTICE OF RIGHT TO CANCEL/RESCISSION MODEL FORM H-8 (GENERAL)
03/17/06

DocMagic *Direct* 800-649-1362
www.docmagic.com